# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #032

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **28th day of June, 2024** are as follows:

**BY McCallum, J.:**

2023-C-00788    *BARBER BROTHERS CONTRACTING COMPANY, LLC VS. CAPITOL CITY PRODUCE COMPANY, LLC; FRANK CUSHENBERRY; AND XYZ INSURANCE COMPANY C/W FRANK CUSHENBERRY AND ROBIN CUSHENBERRY, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILDREN, NOAH CUSHENBERRY AND KHLOE CUSHENBERRY VS. JOHNNY SCOTT AND BARBER BROTHERS CONTRACTING COMPANY, LLC* (Parish of East Baton Rouge)

AFFIRMED AS AMENDED. SEE OPINION.

Hughes, J., dissents and assigns reasons.
Griffin, J., dissents for the reasons assigned by Justice Hughes and assigns additional reasons.

# SUPREME COURT OF LOUISIANA

## No. 2023-C-00788

## BARBER BROTHERS CONTRACTING COMPANY, LLC

## VS.

## CAPITOL CITY PRODUCE COMPANY, LLC; FRANK CUSHENBERRY; AND XYZ INSURANCE COMPANY

## C/W

## FRANK CUSHENBERRY AND ROBIN CUSHENBERRY, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILDREN, NOAH CUSHENBERRY AND KHLOE CUSHENBERRY

## VS.

## JOHNNY SCOTT AND BARBER BROTHERS CONTRACTING COMPANY, LLC

*On Writ of Certiorari to the Court of Appeal, First Circuit, Parish of East Baton Rouge*

**MCCALLUM, J.**

This is a suit seeking damages for injuries sustained by plaintiff, Frank Cushenberry, in a vehicular collision that occurred in a construction zone on Interstate 10 in LaPlace, Louisiana. We granted certiorari to address three issues.

First, we consider whether the trial court's failure to comply with La. Code Civ. P. art. 1793 B by not instructing the jury on the duties imposed pursuant to La. R.S. 32:125, and/or its failure to instruct the jury on the obligations of a commercial driver, like Mr. Cushenberry, constitute(s) reversible error. As we explain more fully below, although the trial court erred in part in its jury instructions, its error does not constitute reversible error under the circumstances of the case.

Next, we consider whether the jury erred by assessing 100 percent of fault for the accident to defendant, Barber Brothers Contracting Company, LLC ("Barber Brothers"). Based on the record and our review of the relevant jurisprudence, we find the jury manifestly erred in finding Barber Brothers solely at fault in the

accident and assessing no fault to Mr. Cushenberry. Keeping in mind that, in disturbing a clearly wrong allocation of fault, a reviewing court is limited to lowering or raising the fault allocation to the highest or lowest point, respectively, within the trier of fact's discretion,[1] we find Barber Brothers to be 80 percent at fault and Mr. Cushenberry 20 percent at fault for the accident.

Finally, we review this matter in light of our recent decision in *Pete v. Boland Marine and Manufacturing Company, LLC*, 23-0170, p. 9 (La. 10/20/23), 379 So. 3d 636, 643, *reh'g. den.*, 374 So. 3d 135 (La. 12/7/23) which held that "appellate courts must look at past general damage awards for similar injuries in determining whether the trier of fact 'abused its much discretion.'" Based on the review of relevant prior cases, we find that the jury abused its discretion in awarding general damages of $10,750,000.00 to Mr. Cushenberry, and loss of consortium damages of $2,500,000.00 to his spouse, Robin Cushenberry, and $1,500,000.00 to each of their minor children, Noah and Khloe. Those awards are beyond the pale, being excessive and disproportionate to past awards for truly similar injuries. In accordance with *Coco v. Winston Indus. Inc.*, 341 So. 2d 332, 335 (La. 1976),[2] we lower those awards to the highest point which is reasonably within the discretion afforded the jury. Given the evidence presented at trial, we find the highest amounts that could be reasonably awarded are: $5,000,000.00 in general damages to Mr. Cushenberry, and loss of consortium damages of $400,000.00 to Mrs. Cushenberry and $100,000.00 to each child.

---

[1] *See Malta v. Herbert S. Hiller Corporation*, 21-0209, p. 31 (La. 12/10/21), 333 So. 3d 384, 407 and *Toston v. Pardon*, 03-1747, p. 17-18 (La. 4/23/04), 874 So. 2d 791, 803.

[2] "Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court."

Therefore, we amend the trial court judgment to allocate a percentage of fault to Mr. Cushenberry, reduce the fault of Barber Brothers, and reduce the general damage and loss of consortium awards. As amended, the trial court judgment is affirmed. Our reasons follow.

**FACTS AND PROCEDURAL HISTORY**

In March 2018, Barber Brothers was working on Louisiana DOTD Project No. H10257.6, an asphalt concrete leveling job on the I-10 exits for LA-3188 in Laplace. The eastbound LA-3188 exit (Exit 206 South LaPlace) is located just east of an elevated interstate portion referred to as the "three-mile bridge."[3] Approximately 900 feet before the end of the bridge is a "hump," which provides an elevated view of the end of the bridge down to Exit 206. The concrete bridge has a very narrow right shoulder.

The project required closing the LA-3188 exits and working nights to minimize inconvenience to the public. The DOTD project engineer designed and stamped the temporary traffic control plan for the eastbound exit closure of LA-3188. The plan called for the installation of an illuminating "message board" display before the three-mile bridge that warned: "Road Construction 8:00 p.m.-5:00 a.m." A reflective "Construction Zone Ahead" sign was erected on the three-mile bridge west of LA-3188 as well. The bridge also displayed a permanent sign for a Louisiana weigh station located east of LA-3188 stating: "W-I-M Area 1 Mile All Trucks Right Lane."

The DOTD approved a traffic control plan that required Barber Brothers to close the exit by placing reflective warning "super-cones" in a line across the exit, west along the fog line of the roadway, and continuing along the fog line seventy feet onto the three-mile bridge. When work was finished for the night, Barber

---

[3] The official name of the three-mile bridge is the Spencer Chauvin Memorial Bridge.

3

Brothers was to open the exit by moving the cones from the fog line into the grass beyond the shoulder, and on the bridge, as close to the guardrail as possible. The standard procedure for removing traffic control devices called for a Barber Brothers truck to back up against traffic along the shoulder of the road while a second worker on foot moved the cones to the edge of the roadway.

On the day of the accident, March 27, 2018, Barber Brothers Traffic Control Supervisor Johnny Scott and another employee, Rashaad Winn, were removing the cones at 5:37 a.m. Mr. Scott was backing a Barber Brothers F250 truck along the shoulder of the highway while Mr. Winn, who was wearing a reflective safety suit and located near the tailgate, moved the construction cones on foot. The F250 truck's taillights, red brake lights and white reverse lights were functioning at the time of the accident. The truck was outfitted with a magnetic amber strobe light on the roof of the cab, however the parties dispute whether the light was attached at the time of the accident.[4] Because the right shoulder of the road narrowed considerably as the F250 backed onto the bridge, Mr. Scott had to leave space for the cones to be placed adjacent to the right guardrail of the bridge as they were moved. Thus, the F250 truck's left front tire was over the fog line into the right travel lane.

At the time of the accident, Mr. Scott was backing the F250 truck at 1 m.p.h. and Mr. Winn had three remaining supercones seventy feet to the west to move. Mr. Cushenberry, an employee of Capitol City Produce Company, LLC, was driving the company's Freightliner box truck in the right lane of I-10 East at 65 m.p.h. when he struck Barber Brothers' F250 truck near the left rear passenger door twenty-one feet past the end of the bridge. Upon impact, Mr. Cushenberry oversteered and lost control of the box truck, which left the roadway, flipped over, and landed in the

---

[4] Plaintiffs contend the amber strobe light was not operating at the time. Barber Brothers maintains it was functioning, and upon impact was knocked into the bed of the truck. The evidence in the record indicates the amber strobe light was found in the bed of the F250 truck immediately following the accident.

woods to the right of I-10 East. As a result of the accident, Mr. Cushenberry sustained a traumatic brain injury and bodily injuries to his face, neck, shoulder, cervical and lumbar spine, requiring numerous surgeries.

Mr. and Mrs. Cushenberry, individually and on behalf of their minor children, filed a petition for damages against Barber Brothers and Mr. Scott.[5] Following a trial, the jury returned a verdict in favor of the Cushenberrys, allocating 100 percent of the fault to Barber Brothers and awarding a total of $13,446,634.65 in damages to Mr. Cushenberry, which included $10,750,000.00 in general damages—itemized as follows:

$2,000,000.00 for past physical pain and suffering,
$1,000,000.00 for future physical pain and suffering,
$2,000,000.00 for past mental pain and suffering,
$2,000,000.00 for future mental pain and suffering,
$2,000,000.00 for loss of enjoyment of life,
$1,000,000.00 for disability, and
$   750,000.00 for scaring and disfigurement.

The jury also awarded loss of consortium in the amount of $2,500,000.00 to Mrs. Cushenberry and $1,500,000.00 to each of the children. The trial court rendered judgment in accord with the jury's verdict.

In a split decision, the court of appeal affirmed the trial court judgment. *See Barber Brothers Contracting Company, LLC v. Capitol City Produce Company, LLC*, 22-696, 22-697 (La. App. 1 Cir. 5/8/23), 368 So. 3d 137. The court of appeal found the trial court failed to comply with La. Code of Civ. P. art. 1793[6] and further erred by allowing closing arguments to proceed without informing counsel that it

---

[5] Barber Brothers filed a petition for damages against Mr. Cushenberry, Capitol City Produce, and their insurer prior to the filing of the Cushenberry lawsuit. Pursuant to an order dated January 28, 2019, the two cases were consolidated for trial.

[6] La. Code Civ. P. art. 1793, relevant to instructions to the jury, provides, in part:

B. The court shall inform the parties of its proposed action on the written requests and shall also inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time prior to their arguments to the jury.

5

was excluding a previously agreed upon jury instruction pertaining to La. R.S. 32:125 that drivers must "slow and move to the left" when encountering vehicles parked on or near the highway.[7] However, the court of appeal found no error in the omission of this jury instruction because it found the statute "to be inapplicable to the facts of this" case given that "Mr. Scott was *backing* the vehicle, albeit slowly." *Id.*, 22-696, 22-697, p. 5, 368 So. 3d at 143 (emphasis in original). The court of appeal also found no error in the trial court's refusal to instruct the jury that Mr. Cushenberry, a licensed commercial driver, should be held to a heightened standard of care. *Id.* The court found the trial court's jury instructions were "appropriate as a whole" and "not so inadequate as to preclude the jury from reaching a verdict based on the law and facts," noting Barber Brothers' presentation of its case and closing arguments sufficiently addressed and placed the issue of Mr. Cushenberry's commercial driver's license before the jury. *Id.*, 22-696, 22-697, pp. 5-6, n.6, 368 So. 3d at 144.

A three-judge panel of the court of appeal found no manifest error in the jury's conclusion that Mr. Cushenberry, the forward-moving driver, was not at fault. The court deemed the jury's conclusion to be reasonable and supported by the evidence in the record. There was no dispute that Barber Brothers' truck was not where it was

---

[7] In relevant part, La. R.S. 32:125, effective through June 3, 2021, provided in part:

> B. When any vehicle making use of any visual signals as authorized by law, including the display of alternately flashing amber or yellow warning lights is parked on or near the highway, the driver of every other vehicle shall:
>
> (1) When driving on an interstate highway or other highway with two or more lanes traveling in the same direction, yield the right-of-way by making a lane change into a lane not adjacent to the parked vehicle, if possible with due regard to safety and traffic conditions. If a lane change is not possible, the driver shall slow to a reasonably safe speed.
>
> (2) Maintain a safe speed for road conditions, if unable or unsafe to change lanes, or driving on a two-lane road or highway.
>
> C. This Section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.

6

supposed to be and was slightly in Mr. Cushenberry's lane of travel at the time of the accident. The testimony also indicated the possibility that the F250 truck may have lacked sufficient lighting to warn Mr. Cushenberry of its location.

As to damages, two judges concluded the general damage award "is not beyond that which a reasonable jury in its discretion could assess in such a case." *Id.*, 22-696, 22-697, p. 11, 368 So. 3d at 147. The majority noted that Mr. Cushenberry's life has drastically changed due to his injuries, and he is fully aware of the impact of his traumatic brain injury on his life. The jury heard extensive testimony about the physical and mental pain and suffering that Mr. Cushenberry has endured and will continue to endure because of his injuries. Because the majority found the record was replete with evidence supporting the general damage award, it determined it could not consider comparable damage awards, citing *Bouquet v. Wal-Mart Stores, Inc.*, 08-0309 (La. 4/4/08), 979 So. 2d 456, 459.[8]

Likewise, two judges found no abuse of discretion in the jury's award of damages for loss of consortium to Mrs. Cushenberry and the two children. The evidence in the record indicated Mr. Cushenberry "went from being athletic, outgoing and being very involved 'in everything' with his family, to being depressed, easily irritable, forgetful, in constant pain, and secluded/disengaged. In short, Mr. Cushenberry is 'not the same.'" *Id.*, 22-696, 22-697, p. 13, 368 So. 3d at 148.

Chief Judge Guidry dissented, in part, as to the general damages and loss of consortium awards. *See Barber Brothers*, 22-696, 22-697 pp. 1-3, 368 So. 3d at 149-150 (Guidry, C.J., dissenting in part). He noted that, although Mr. Cushenberry's life has changed, he is still able to interact with his family in daily

---

[8] The court of appeal rendered its decision on May 8, 2023, prior to our decision in *Pete v. Boland Marine and Manufacturing Company, LLC*, 23-0170 (La. 10/20/23), 379 So. 3d 636, *reh'g. den.*, 374 So. 3d 135 (La. 12/7/23).

activities. Judge Guidry found that the general damages to be clearly excessive, and beyond that which a reasonable trier of fact in his discretion could assess in such a case. He would reduce the general damages from $10,750,000.00 to $4,300,000.00. He also found a lack of support in the record for the substantial loss of consortium awards, noting Mr. Cushenberry is still a "great husband" and a "good dad." *Id*. In his view, the loss of consortium award to Mrs. Cushenberry should be reduced from $2,500,000.00 to $330,000.00, and the loss of consortium award to each child should be reduced from $1,500,000.00 to $50,000.00.

We granted Barber Brothers' writ application to review the lower courts' rulings. *Barber Brothers Contracting Company, LLC v. Capitol City Produce Company, LLC*, 2023-0788 (La. 10/31/23), 372 So. 3d 799. Having considered the briefs and arguments of counsel, we now address, in turn, Barber Brothers' assignments of error:

1. The trial court's erroneous jury instructions skewed the jury's deliberations regarding fault.

2. The jury erred in finding Barber Brothers 100 percent at fault for the accident; and,

3. The jury awards for general damages and loss of consortium are grossly excessive.

## DISCUSSION

### *Jury instructions*

Barber Brother maintains that the trial court's jury instructions were erroneous and prejudicial in two respects. First, after closing arguments, the trial court excluded from the jury charges a previously agreed upon jury instruction proposed by the defense pertaining to La. R.S. 32:125. The proposed instruction informed the jury that, as set forth in La. R.S. 32:125 B, drivers who encounter vehicles with warning lights parked on or near the shoulder of the road must slow down and move to the left. By excluding this instruction, Barber Brothers argues, the trial court

8

failed to comply with La. Code Civ. P. art. 1793 B ("The court shall inform the parties of its proposed action on the written requests and shall also inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time prior to their arguments to the jury.").

Second, Barber Brothers contends, the trial court erred by including plaintiffs' proposed instruction that contractors, like Barber Brothers, owe a heightened duty of safety to motorists, yet rejecting Barber Brothers' proposed instruction that professional truck drivers who carry a commercial driver's license (CDL), like Mr. Cushenberry, have a heightened duty of care to motorists. Instead, the trial court gave a revised jury charge, instructing the jury that Mr. Cushenberry had a duty to drive in the right lane and no duty to move to the left lane when approaching a vehicle on the right shoulder. This unilateral, last-minute revision of the jury charges prejudiced Barber Brothers and negated defense counsel's closing argument that Mr. Cushenberry had a duty to move from the right lane to the left lane when encountering a vehicle on the right shoulder. Conversely, the revised jury charges validated plaintiffs' counsel's closing argument that Mr. Cushenberry had a duty to stay in the right lane and no duty to move over for vehicles on the shoulder. Thus, Barber Brothers contends, the trial court's failure to properly instruct the jury on Mr. Cushenberry's duties as an approaching motorist and CDL driver skewed the jury's deliberations in his favor, prejudiced Barber Brothers, and explains the jury's failure to assess any fault to Mr. Cushenberry, particularly given the undisputed evidence that Mr. Cushenberry failed to take any evasive action to avoid the accident.

Louisiana Code of Civil Procedure art. 1792 B requires a trial judge to instruct jurors on the law applicable to the cause submitted to them. "The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate." *Adams v. Rhodia, Inc*., 07-2110, pp. 5-6 (La. 5/21/08), 983 So. 2d

9

798, 804. The question for the reviewing court is whether the trial judge adequately instructed the jury. *See Wooley v. Lucksinger*,09-0571, p. 81 (La. 4/1/11), 61 So. 3d 507, 574. The *Wooley* Court explained the concept of adequate jury instructions:

> "[a]dequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error."

*Id.,* 09-0571, p. 81, 507 So. 3d at 574, *quoting Adams*, 07-2110, p. 6, 983 So. 2d at 804.

"[T]he giving of an allegedly erroneous jury instruction will not constitute grounds for reversal unless the instruction is erroneous, and the complaining party has been injured or prejudiced thereby." *Rosell v. ESCO,* 549 So.2d 840, 849 (La. 1989). Louisiana jurisprudence is well-settled that a reviewing court must exercise great restraint before it reverses a jury verdict due to erroneous jury instructions. *Wooley*, 09-0571 p. 81, 61 So. 3d at 574; *Adams,* 07-2110 p. 6, 983 So.2d at 804. As the *Wooley* Court indicated:

> "[t]rial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge."

*Id.*, 09-0571, pp. 81-82, 61 So. 3d at 574, *quoting Adams,* 07-2110, p. 6, 983 So. 2d at 804. When a reviewing court finds the jury was erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. *Adams,* 07-2110, p. 6, 983 So. 2d at 804.

10

To determine whether the trial court gave an erroneous jury instruction, reviewing courts must assess the targeted portion of the instruction in the context of the entire jury charge "to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. *Adams,* 07-2110 p. 7, 983 So. 2d at 804; *Nicholas v. Allstate Insurance Company*, 99-2522, p. 8 (La. 8/31/00), 765 So.2d 1017, 1023; *Rosell,* 549 So. 2d at 849. The ultimate inquiry on review is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. *Adams,* 07-2110 p. 7, 983 So. 2d at 804; *Nicholas,* 99-2522 p. 8, 765 So. 2d at 1023.

"The law is clear the review function is not complete once error is found. Prejudice to the complaining party cannot automatically be assumed from the mere fact of an error. Instead, the reviewing court must then compare the degree of the error with the adequacy of the jury instructions as a whole and the circumstances of the case." *Wooley*, 09-0571, p. 82, 61 So. 3d at 574. The manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. *Id*., 09-0571, p. 82, 61 So. 3d at 575. Thus, on appellate review of a jury trial, the mere discovery of an error in the trial judge's instructions does not of itself justify the appellate court conducting the equivalent of a trial *de novo,* without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. *Id*., 09-0571, p. 82-83, 61 So. 3d at 575.

Considering these principles, we now examine the trial court's jury instructions and those proposed by the parties.

The record reflects that plaintiffs' counsel requested that the trial court instruct the jury as follows: "In Louisiana, vehicles are required to drive on the right side of all multilane highways." Counsel for Barber Brothers objected, but then withdrew

11

her objection when the plaintiffs agreed to a balancing instruction based on La. R.S. 32:125, which the trial court agreed to give to the jury. The trial court also agreed to a special instruction proposed by the plaintiffs that contractors working on road construction projects owe a heightened duty to motorists. The trial court, however, rejected Barber Brothers' request that the jury be instructed on the standard of care of a CDL driver. Counsel for Barber Brothers objected to the exclusion of the jury instruction on the duty of a commercial driver and to the inclusion of the special instruction on the duty of the contractors. He argued: "[t]he inclusion of a special instruction that pertains to Barber Brothers with no corresponding instruction to Mr. Cushenberry unfairly focuses the jury on only one of the actors of this accident. If the special duty applies to construction firms, then it should also apply to commercial drivers."

During closing arguments, plaintiffs' counsel argued that Mr. Cushenberry's truck was "in the right lane where it was supposed to be." In response, and consistent with the previously agreed to jury instruction on La. R.S. 32:125, defense counsel argued to the jury that Mr. Cushenberry had a legal duty to slow down and move to the left travel lane, stating:

> [Defense counsel]: And what do the manuals say? When approaching an emergency vehicle stopped on the roadside or work zone, you should proceed with caution by slowing and yielding the right of way by making a lane change into the lane not next to that authorized emergency vehicle or work zone if safety and traffic conditions permit. This is the obligation, which is called the mover over obligation, of CDL drivers. And that was Mr. Cushenberry's obligation, as well as the reasonably prudent driver. And that is under those conditions in a work zone, that's what he should have done. He should have moved over into the left-hand lane.

Immediately after closing arguments, plaintiffs' counsel objected to the jury instruction on La. R.S. 32:125. Without the jury present, the parties again debated the inclusion of this instruction. The trial court, observing that Title 32 of the Revised Statutes, relating to Motor Vehicle and Traffic Regulations, is a "quasi-

criminal statute," that must be "strictly interpreted and narrowly applied," found that La. R.S.32:125 did not apply to this case. Over defense counsel's objection, the trial court excluded the instruction on the basis that La. R.S. 32:125 only applies to vehicles "parked on or near" the highway, and not to a moving vehicle such as Barber Brothers' F-250 truck. The trial court then charged the jury and gave the following instruction regarding the duties of Mr. Cushenberry and Barber Brothers:

> Our law requires that a motorist generally [] keep his vehicle under proper control and at a proper speed and to maintain a proper lookout for hazards, which using ordinary care and observation one should be able to see. A motorist is not absolved from liability because of his failure to see what he could have seen by the exercise of due diligence. And a motorist's duty to look ahead and observe never ceases.

> A motorist is legally charged with seeing that which he or she should see in the exercise of due diligence. For a driver to look and fail to see what he should have seen is the equivalent of the driver not looking at all and is negligence.

> In Louisiana a vehicle is required to drive on the right side of all multilane highways, except when passing another vehicle going in the same direction of the traffic, when the right half of the roadway is closed while under construction or repair, or when the road is designated for one-way travel. A motorist has a duty to obey signals, warnings and markings of warning signs, signals and barricades placed on the highway under construction and repair.

> Any firm or person contracting with the highway department to repair a road owes a duty to the public to perform the contract in such a manner so as not to expose those using the roads to dangers, to any dangers, which could be prevented using ordinary and reasonable care. This obligation on the part of the highway department and the contractor imposed a duty to adequately warn motorists of the existence of any dangers created by the road repairs.

Based on our review of the record, we agree with the court of appeal that the trial court did not comply with La. Code Civ. P. art.1793 B by failing to instruct the jury on the duties imposed by La. R.S. 32:125. Prior to closing arguments, the trial court specifically informed the parties that it would instruct the jury on La. R.S. 32:125, but, after the conclusion of those arguments, it refused to do so. This was clear error on the trial court's part. However, our inquiry does not end there, and we

must consider whether the omission of this jury charge so prejudiced Barber Brothers that it could not get a fair result. This requires that we examine the entire jury instructions under the circumstances of the case.

Barber Brothers does not dispute that the F250 was a few inches into the right travel lane when the accident occurred. Rather, Barber Brothers argues the trial court should have included the jury instruction on La. R.S. 32:125, as the undisputed evidence indicated the F250 had its taillights, back-up lights, and brake lights on and the body of the F250, for the most part, was on the right shoulder and nearly stationary; the F250 was moving in reverse at only 1 m.p.h.[9] We disagree and find no reversible error in the exclusion of this jury charge.

At the time of the accident, La. R.S. 32:125 B provided, in pertinent part:

B. When any vehicle making use of any visual signals as authorized by law, including the display of alternately flashing amber or yellow warning lights *is parked on or near the highway,* the driver of every other vehicle shall:

(1) When driving on an interstate highway or other highway with two or more lanes traveling in the same direction, yield the right-of-way by making a lane change into a lane not adjacent to the *parked vehicle*, if possible with due regard to safety and traffic conditions. If a lane change is not possible, the driver shall slow to a reasonably safe speed.

(2) Maintain a safe speed for road conditions, if unable or unsafe to change lanes, or driving on a two-lane road or highway.

(Emphasis added.)

As noted, the trial court excluded the proposed jury instruction on La. R.S. 32:125 because it determined the statute applied to vehicles "parked on or near" the highway, and not to a moving vehicle such Barber Brothers' F250 truck. This determination is consistent with our case law regarding statutory interpretation. It is well-settled that the starting point in the interpretation of any statute is the language of the statute itself. *Carollo v. Dep't of Transportation & Dev.*, 21-01670, p.12 (La.

---

[9] The electronic control module ("ECM") of the F250 truck showed that Mr. Scott was moving backwards at 1 m.p.h. while braking, and plaintiffs' accident reconstruction expert, Mr. Ric Robinette, testified the F250 was "very close to park, but it is slightly moving."

14

9/1/22), 346 So. 3d 751, 759. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written, and no further interpretation may be made in search of the intent of the legislature." La. C.C. art. 9; La. R.S. 1:4; *Hicks v. USAA Gen. Indem. Co.*, 21-00840, p. 6 (La. 3/25/22), 339 So. 3d 1106, 1111.

The statute at issue is neither ambiguous nor subject to multiple interpretations. Louisiana Revised Statute 32:125 B plainly applies only to "parked" vehicles and, "park" is defined as "to bring (a vehicle) to a stop and keep standing at the edge of a public way."[10] The terms "parked on or near the highway" in Paragraph B and "parked vehicle" in Subparagraph B (1) are clear and unambiguous; the term "parked" does not include traveling vehicles, no matter how slow those vehicles are traveling. The trial court, thus, did not err in determining that La. R.S. 32:125 applies only to parked vehicles. The evidence was undisputed that Barber Brothers' F250 truck was moving and not "parked" at the time of the accident. Its failure to charge the jury on La. R.S. 32:125 after having agreed to do so was harmless error and did not prejudice the defense.

We now turn to the trial court's failure to charge the jury on the standard of care of a CDL driver, and Barber Brother's contention that this misled the jury in dispensing justice. In *Davis v. Witt*, 02-3102 (La. 7/2/03), 851 So. 2d 1119, we recognized that a commercial driver's superior knowledge and training as a professional truck driver held him to a higher standard of care than the motoring public. Here, plaintiffs' witness, Mr. Caleb Prejean, vice president of operations for Capitol City Produce responsible for hiring its truck drivers, testified that Mr. Cushenberry held a Class B CDL and was required to comply with Louisiana's motor vehicle and traffic safety statutes as well the "rules of the road" set forth in

---

[10] https://www.merriam-webster.com/dictionary/parked

the CDL Manual.[11] Both Mr. Robinette, plaintiffs' own accident reconstruction expert, and Mr. Rodney Ellis, Barber Brothers' driving safety expert, agreed that Mr. Cushenberry, a CDL driver, had a heightened duty of care when approaching a road construction zone. Section 2.82 of a CDL Manual introduced at trial references move-over laws, road hazards and a commercial driver's duty when approaching a work zone, providing, in part:

**Move-Over Laws**

[M]ove over-laws have been enacted, which require drivers to slow and change lanes when approaching a roadside incident or emergency vehicle. Signs are posted on roadways in states that have such laws.

When approaching an authorized emergency vehicle stopped on the roadside or a work zone, you should proceed with caution by slowing and yielding the right-of-way by making a lane change into a lane not next to that of the authorized emergency vehicle or work zone if safety and traffic conditions permit. If a lane change is unsafe, slow down and proceed with caution while maintaining a safe speed for traffic conditions.

Slow down and be very careful if you see any of the following road hazards.

**Work Zones.** When people are working on the road, it is a hazard. There may be narrower lanes, sharp turns, or uneven surfaces. Other drivers are often distracted and drive unsafely. Workers and construction vehicles may get in the way. Drive slowly and carefully near work zones. Use your four-way flashers or brake lights to warn drivers behind you.

It is undisputed that Mr. Cushenberry was operating his employer's commercial freight box truck loaded with produce when he struck Barber Brother's F250 truck in the marked road construction zone. Mr. Cushenberry testified that he is familiar with the CDL Manual and had studied it for the exam to obtain his CDL.

---

[11] Leizerman, Michael Jay, *Litigating Truck Accident Cases*, The Truck Driver's Negligence, §8:2, states:

An excellent source for establishing the standard of care - what a reasonable truck driver would do in a situation - is the Commercial Driver's License (CDL) Manual. Every state has adopted a nearly identical CDL Manual. The CDL Manual establishes specific rules that every professional truck driver must know to obtain a CDL. Many courts have held that violations of CDL Manual rules constitute evidence of negligence. *See*, *e.g.*, *Langille v. Transco, Inc.*, 2013 WL 6185347 (D. Wyo. 2013).

He further testified that he was taught in CDL school that drivers must be more alert in construction zones and to slow and change lanes when approaching a vehicle on the shoulder. Mr. Cushenberry also acknowledged that CDL drivers have greater responsibilities than ordinary drivers.

We find the trial court erred by not charging the jury on the standard of care of a CDL driver approaching a highway construction zone. Nevertheless, based on our review of the entire jury charges, although they were not a model of balance and impartiality, they were minimally adequate to allow the jurors to reach a verdict based on the law and facts. That is, the jury was informed that Mr. Cushenberry had a duty to maintain proper speed and control of his vehicle; a duty to maintain a proper lookout for hazards; a constant duty to look ahead and observe that which should be seen in the exercise of due diligence; and a duty to obey warnings signs and signals placed on the road under construction and repair. Accordingly, we find no reversible error in the trial court's jury instructions to warrant a *de novo* review.

We turn now to Barber Brother's second assignment of error and review the jury's verdict and findings under the manifest error standard of review.

### *Fault*

Barber Brothers contends the jury's failure to assess any fault to Mr. Cushenberry is manifestly erroneous, and its finding Barber Brothers solely at fault is unreasonable. The witnesses who testified as to liability agreed that Mr. Cushenberry should have seen Barber Brothers's F250 truck 900 feet ahead – regardless of whether the amber strobe light was attached and flashing. The evidence indicated that Mr. Cushenberry took no evasive action whatsoever to avoid striking the F250 truck in the construction zone even though its taillights, rear brake lights and reverse lights were functioning, reflective supercones were present, and Mr. Winn was wearing a reflective safety suit at the time. Barber Brothers further

17

argues the court of appeal failed to apply traditional duty/risk and comparative fault principles in reviewing the jury's allocation of fault.

This Court previously explained the standard of review to be applied by appellate courts when reviewing a trier of fact's allocation of fault. "Although the Louisiana Constitution extends appellate jurisdiction in civil cases to both law and facts, the exercise of this power is limited by the jurisprudential rule that factual determinations of the trier of fact will not be set aside by a reviewing court unless they are manifestly erroneous or clearly wrong." *Brewer v. J.B. Hunt Transport, Inc.*, 09-1408, p. 9 (La. 3/16/10), 35 So. 3d 230, 237 (citations omitted). To reverse a factfinder's determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and (2) the court must further determine the record establishes the finding is clearly wrong. *Id.*, 09-1408, p. 12, 35 So. 3d at 239, citing *Stobart v. State, Department of Transportation and Development,* 617 So. 2d 880, 882 (La. 1993).

Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Id.* If the factual findings are reasonable considering the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.,* 09-1408, pp. 12-13, 35 So. 3d at 239. "Although deference to the factfinder should be accorded, because appellate courts have a constitutional duty to review both law and facts, they have the right and the obligation to determine whether a trial court verdict is clearly wrong based on the evidence, or clearly without evidentiary support." *Brewer*, 09-1408, p. 13, 35 So. 3d at 240, citing *Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, p. 8 (La. 7/5/94), 639 So. 2d 216, 221.

Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous. *Brewer*, 09-1408, p. 13, 35 So. 3d at 239. However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, a reviewing court may well find manifest error. *Id*. Where such factors are not present and a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. *Id*., 09-1408, p. 13, 35 So. 3d at 239-40. "This is not to say, however, that factual determinations cannot ever, or hardly ever, be upset." *Id*., 09-1408, p. 13, 35 So. 3d at 240, citing *Ambrose*, 93-3099, p. 8, 639 So. 2d at 221.

Actions for personal injury arise from La. C.C. art. 2315, which provides in subpart A that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." However, under our comparative fault system, "[i]f a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss." La. C.C. art. 2323(A).

At trial, Mr. Cushenberry testified that he has no recollection whatsoever of the early morning accident. Plaintiffs' counsel repeatedly argued to the jury that Mr. Scott caused the accident when he "swerved" the Barber Brothers' truck into the path of Mr. Cushenberry's Freightliner box truck. However, the evidence in the record does not support this version. The ECM of the F250 indicated that Mr. Scott[12] was backing up at 1 m.p.h. while braking, and Mr. Robinette noted the F250 was

---

[12] Mr. Scott did not testify at trial and his deposition was not introduced at trial.

"very close to park, but it [was] slightly moving." Mr. Robinette testified that, based on his review of the evidence provided to him, "prior to impact [the F250] was a little bit more in the [right] lane than at the time of impact." On impact, the F250 had its front wheels turned to the right, with the left front tire 12-18 inches, and the left rear fender 9-12 inches, into the right travel lane. The F250 was within 2-5 degrees parallel with the fog line and the point of impact was approximately 3-4 inches from the fog line; the inside edge of the left rear tire was 3-4 inches from the fog line. Mr. Robinette explained that Mr. Scott was slowly moving from the right lane to the shoulder. He described Mr. Scott's action as a "parallel parking maneuver" in which a driver slowly backs up to a curb, "indicat[ing] that earlier in the sequence the pickup truck was probably a little further into the road."

Mr. Robinette further testified that, from 900 feet away, Mr. Cushenberry would see the Barber Brothers' F250 truck on the edge of the road. He testified that even with no amber flashing light, at 400 feet an attentive driver could discern the taillights, brake lights, and backup lights of the F250, as well as the reflective traffic safety supercones and the reflective safety suit worn by Mr. Winn. At 400 feet, a CDL driver would detect that the F250 was in reverse.

Mr. Robinette opined that had Mr. Cushenberry engaged in a normal (0.2 g-force[13]) lane change beginning 400 feet from the F250, he would have moved 16 feet to the left 100 feet before he reached the F250. Even if Mr. Cushenberry had waited until 200 feet (2 seconds from impact) to begin his lane change, he would have been able to move over 7 feet, avoiding the accident. Mr. Robinette conceded

---

[13] G-force, also known as gravitational force, is a term used to describe the force of gravity acting on an object. It is a measurement of the acceleration experienced by an object due to gravity and is typically measured in units of acceleration. G-force is an important concept in physics, particularly in the study of motion and the behavior of objects in space.

https://www.geotab.com/au/blog/what-is-g-force.

that Mr. Cushenberry would have avoided the accident by "a very few inches" had he been driving in the center of the right lane rather than close to the fog line.

Mr. Brent Munyon, Barber Brothers' accident reconstruction expert, performed similar calculations, noting that Mr. Cushenberry could execute a normal 0.2 g-force lane change within 184 feet, and that even waiting until 100 feet from impact to turn would have resulted in a 3.5-foot shift to the left, easily avoiding the accident.

Plaintiffs' witness Mark Liggett testified that on the morning of the accident, he was driving in the left lane en route to New Orleans when he passed the Capitol City Produce truck in the right lane near the Tanger Outlet Mall (several miles west of the three-mile bridge). When he reached the apex of the three-mile bridge he saw "a truck backing up on the shoulder of the road with a gentleman out in front. It looked like he was picking up something. I couldn't be for sure – it was a little dim, but there was a truck essentially backing up after the [LA]-3188 off-ramp." Mr. Liggett testified that he did not see an amber flashing light on the roof of the F250, yet he did see the truck's taillights and reverse lights, though they appeared "somewhat dim" due to the sodium lights on the road.[14]

Scott Baudoin, a fact witness for the plaintiffs, testified that he and his wife were traveling in the right lane on the three-mile bridge and observed the taillights of the Capitol City Produce box truck two to three hundred yards ahead of them, but he did not see an amber flashing light, the F250 truck, Mr. Winn, or the supercones. According to Mr. Baudoin, just past the end of the three-mile bridge, the box truck suddenly swerved left, then right, overcorrected, traveled off the road, flipped over

---

[14] Mr. Liggett also testified that he learned of the accident when his wife, who is director of human resources for Capitol City Produce, called him at work to inform him that she was going to Tulane Medical Center in New Orleans because one of the company's drivers had been in a serious accident on the interstate that morning. When Mr. Liggett learned of the location of the accident, he told Mrs. Liggett of what he had witnessed earlier that morning. She had the safety officer for Capitol City Produce contact him. The information Mr. Liggett provided was conveyed to Capitol City Produce's attorney.

and landed in the woods to the right of the interstate. Mr. Baudoin testified that he pulled onto the right shoulder and exited his vehicle to assist the driver of the box truck. When he glanced over toward the accident site looking for additional help, he first noticed the damaged Barber Brothers' F250 truck.

Mr. Winn, whose video deposition was played to the jury, testified that he was moving the supercones to the right shoulder when he observed the box truck approaching in the right lane. When it appeared the box truck was not going to change lanes, Mr. Winn moved out of the way. The box truck passed, and seconds later Mr. Winn heard a loud crash, but did not see the collision. When he turned to see what had happened, Mr. Winn saw that the box truck had struck the Barber Brothers' F250 on the left side with Mr. Scott in the driver's seat. According to Mr. Winn, that morning prior to the accident, other motorists approaching the construction zone from the right lane moved over to the left lane without incident.

Importantly, the undisputed evidence in the record indicates DOTD erected an illuminating message board warning "Road Construction 8:00 p.m.-5:00 a.m." just before the three-mile bridge, as well as reflective "Construction Zone Ahead" warning sign on the bridge. David Ciolino, a DOTD highway inspector, confirmed that the construction warning signs were posted on the day of the accident and Mr. Liggett acknowledged that he saw them early that morning.[15]

The first duty of a motorist is to maintain a sharp lookout ahead. *Baumgartner v. State Farm Mut. Auto. Ins. Co.*, 356 So. 2d 400 (La. 1978). Even if an obstruction on a road is illegal, *e.g.*, a stalled vehicle, a motorist is not absolved from the duty to look ahead and exercise the required degree of care in observing that obstruction. *See Dorty v. City of Pineville*, 01-1470 (La. App. 3 Cir. 4/3/02), 815 So. 2d 393, 398;

---

[15] Mr. Liggett testified the blinking message board read "9:00 p.m. - 5:00 a.m."

22

*Desadier v. Safeway Ins. Co.,* 97-1412, pp. 6-7 (La. App. 3 Cir. 4/8/98), 712 So.2d 925, 929; *Culpepper v. Leonard Truck Lines*, 208 La. 1084, 24 So. 2d 148 (1945).

Based the evidence presented at trial, we find the jury manifestly erred in failing to allocate any fault to Mr. Cushenberry. Barber Brothers did not dispute that its F250 truck was, at most, 18 inches into the right lane at the time of the accident. It was further undisputed that Mr. Cushenberry was familiar with the three-mile bridge, as he often drove I-10 East to New Orleans to deliver produce for his employer. On the morning of the accident, DOTD construction signs were posted before and on the bridge to warn motorists of the road construction ahead. The Barber Brothers F250 truck, for the most part, was on the right shoulder of the highway with its taillights, reverse lights and brake lights functioning. By all accounts, Mr. Scott was backing up the F250 on the shoulder at 1.5 feet per second, while Mr. Cushenberry was approaching the construction zone from the right lane close to the fog line at approximately 100 feet per second. Safety supercones marked the construction zone and Mr. Winn was wearing a reflective safety suit. Both expert and fact witnesses testified that Mr. Cushenberry should have seen the taillights, reverse lights, and brake lights on the Barber Brothers truck, the supercones, and Mr. Winn from the three-mile bridge. The experts all opined that Mr. Cushenberry had sufficient time to move to the center of the right lane or into the left lane to avoid the construction zone. Other drivers who were approaching the construction zone from the right travel lane that morning did so without incident. The record contains no evidence that Mr. Cushenberry took any evasive action to avoid hitting Barber Brothers' truck. The jury's conclusion that Barber Brothers was solely at fault in causing the accident is unreasonable.

Because we find that the trial court was clearly wrong in assessing all the fault to Barber Brothers and none to Mr. Cushenberry, we now must consider how fault should be reallocated. As instructed by *Malta*, 21-00209, p. 31, 333 So. 3d at 407,

23

*citing Toston*, 03-1747, p. 17-18, 874 So. 2d at 803, the percentages of fault are to be adjusted to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion.

In determining the highest or lowest percentage of fault that reasonably could be assessed under the facts of this case, we are guided by factors set forth *Watson v. State Farm Fire & Casualty Insurance Co.*, 469 So.2d 967 (La. 1985). In *Watson*, we noted "various factors may influence the degree of fault assigned," including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties. *Id*., 469 So. 2d at 974.

Applying the *Watson* factors to this case, we review that portion of the trial evidence tending to establish the parties' respective fault. Mr. Scott, the driver of the Barber Brothers F250, did not comply with the DOTD traffic safety plan by staying entirely on the right shoulder when slowly backing up. Had Mr. Scott remained on the shoulder, it is more than likely that the accident would not have occurred. On the other hand, Mr. Cushenberry did not maintain a proper lookout for hazards ahead and failed to see that which he should have seen in the exercise of due diligence. He did not heed the DOTD signs warning of the construction zone ahead and took no action to avoid it. While both Mr. Scott and Mr. Cushenberry each bear a degree of responsibility for the accident, based on our review of the record, we find that the highest amount of fault that a reasonable factfinder could have assessed Mr.

24

Cushenberry is 20 percent, and the lowest amount of fault that a reasonable factfinder could have assessed to Barber Brothers is 80 percent.

We turn now to consider the issue of damages.

***Damages***

Barber Brothers contends that the jury abused its discretion in awarding general damages of $10,750,000.00 to Mr. Cushenberry and loss of consortium of 2,500,000.00 to Mrs. Cushenberry and $1,500,000.00 each to Noah and Khloe, the minor children. Barber Brothers maintains the awards are grossly excessive, not supported by the evidence, and disproportionate to past awards for truly similar injuries. We agree.

It is well-settled that appellate courts "have a constitutional duty to review the law and facts and thereafter render a judgment on quantum based on the merits," including "determining whether the jury has abused its 'much discretion' . . . in awarding general damages." *Carollo v. Wilson*, 353 So. 2d 249, 252 (La. 1977) (citing La. Const. art. V, § 10 (B), which provides, in pertinent part, that "appellate jurisdiction of a court of appeal extends to law and facts."). Recently, in *Pete*, 23-0170, p. 9, 379 So. 3d at 643, we held that "appellate courts must look at past general damage awards for similar injuries in determining whether the trier of fact 'abused its much discretion.'" We clarified that "a review of prior awards is not the only factor to be considered in evaluating whether a general damage award is an abuse of discretion; it is a starting point." *Id*. We explained:

> No two cases will be identical. The review of prior awards will simply serve to illustrate and supply guidance in the determination of damages. Other factors are to be considered as well. We explained in *Youn* [*v. Mar. Overseas Corp.*, 623 So. 2d 1257 (La. 1993)] that:
>
>> [r]easonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the

25

> particular circumstances that the appellate court should increase or reduce the award.

*Youn*, 623 So. 2d at 1261. *Youn* is consistent with this Court's earlier statement in *Reck* [*v. Stevens*, 373 So. 2d 498 (La. 1979)], that "prior awards may serve as an aid in [the] determination [of excessiveness or insufficiency] only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards (not selected past awards, but the mass of them) for (truly) 'similar' injuries." *Reck*, 373 So. 2d at 501 (citing *Coco v. Winston Indus., Inc.*, 341 So. 2d 332, 334 (La.1976)).

> We also recently reiterated that "the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." *Malta v. Herbert S. Hiller Corp.*, 21-00209, p. 32 (La. 10/10/21), 333 So. 3d 384, 408; *see also*, *CD*, 22-00961, p. 5, 366 So. 3d at 1249 (citing *Coco*, 341 So. 2d at 334) ("the question is whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it."). Thus, to determine whether a trier of fact abused its discretion in its award for general damages, an appellate court is to consider the particular facts and circumstances of a case, in conjunction with a review of prior awards. This applies to claims of excessiveness as well as insufficiency in an award.

> We do not abandon the two-step analysis for the appellate review of a general damage award but modify the analysis as follows. The question of whether the trier of fact abused its discretion in assessing the amount of damages remains the initial inquiry. However, to evaluate this issue, an appellate court is to include a consideration of prior awards in similar cases, as well as the particular facts and circumstances of the case under review. If an abuse of discretion is found, the court is to then also consider those prior awards to determine "the highest or lowest point which is reasonably within that discretion." *Jones*, 22-00841, p. 16, 359 So. 3d at 464.

*Pete*, 23-0170, pp. 9-10, 379 So. 3d at 643-44.

With these principles in mind, we first examine the facts and circumstances of this case and the record "to determine whether the record clearly reveals that the jury abused its discretion" in awarding general damages in the amount $10,750,000.00. *Carollo*, 353 So.2d at 252. Based on a review of the record, coupled with a study of prior awards in truly similar cases, we conclude that the jury abused its discretion in this award.

The record indicates that Mr. Cushenberry sustained extensive physical injuries and a traumatic brain injury in the accident. Dr. Patrick Greiffenstein, a

trauma surgeon at LSU Health Sciences Center University Medical Center ("UMC") treated Mr. Cushenberry upon his arrival at the hospital following the accident. According to Dr. Greiffenstein, Mr. Cushenberry sustained craniofacial injuries, including a fractured eye socket and left cheek bone, a double fracture to the mandible, and a dislodged maxilla. The soft tissue damage caused significant facial swelling impairing his ability to breathe, so he had to be intubated. In addition to the craniofacial injuries, Mr. Cushenberry had cervical spine and shoulder injuries. Noting that Mr. Cushenberry required a blood transfusion and developed a severe respiratory infection while in the intensive care unit, Dr. Greiffenstein described him as being in critical condition and at risk of dying for several days.

Dr. Mark Stalder, a UMC plastic and reconstructive surgeon, testified that he operated on Mr. Cushenberry two days after the accident. Dr. Stalder described Mr. Cushenberry's face as being "grossly unstable" at that point, such that he had no use of his throat, mouth, or tongue. Dr. Stalder reconstructed Mr. Cushenberry's face, which required peeling back the facial and cranial skin, and using screws to anchor the reconstruction of the eye socket and mandible. When he stitched the skin back in place, Mr. Cushenberry was left with a significant scar. As a result, Mr. Cushenberry later underwent two "painful" laser scar revision procedures under general anesthesia.

Dr. Kevin McCarthy, a board-certified orthopedic surgeon specializing in spine-related conditions and pain management, treated Mr. Cushenberry for his cervical spine injury after his discharge from UMC. According to Dr. McCarthy, additional diagnostic tests indicated Mr. Cushenberry had not sustained a fracture to C1, as initially thought, but he had a herniation at C5-6. Although Dr. McCarthy could not say for certain that the herniation occurred in the accident, in his opinion, the symptoms (pain and discomfort) from the herniation are related to the accident. Dr. McCarthy further testified that an MRI of the lumbar spine indicated no

27

herniations or nerve compression in the lower back.  To treat the C5-6 herniated disc, Dr. McCarthy performed epidural steroid injections and endoscopic rhizotomies[16] on the neck.   Because Mr. Cushenberry obtained only temporary relief from these procedures, Dr. McCarthy recommended – and Mr. Cushenberry eventually underwent – an anterior cervical discectomy with a fusion.  Dr. McCarthy opined that Mr. Cushenberry's shoulder injury exacerbated his neck pain, so he referred him to Dr. Gerard Murtagh, an orthopedic surgeon specializing in shoulder injuries.

Dr. Murtagh diagnosed Mr. Cushenberry as having a torn rotator cuff and torn labrum of the left shoulder.  He performed an arthroscopic debridement and capsule labral stabilization on the shoulder. Although Mr. Cushenberry had extensive physical and rehabilitative therapy post-surgery, he developed adhesions, fibrosis, and restricted range of motion, requiring a second surgical debridement.  According to Dr. Murtagh, Mr. Cushenberry continues to experience pain in the neck and shoulder.  He opined Mr. Cushenberry has an eight percent (8%) total body disability given the limited range of motion of the left arm; he cannot lift anything above the shoulder.

Regarding the brain injury, Dr. Jeffrey Lewine, a neuroscientist, and traumatic brain injury expert, testified Mr. Cushenberry suffered both direct and secondary brain injuries.  He explained that the head trauma resulted from the brain repeatedly striking the skull cavity due to linear acceleration and rotational forces, otherwise known as primary injury forces. The primary injury forces cause damage to brain cells and to axons ("the initial injury") which sets into motion a cascade of metabolic, hemodynamic, and biochemical events that takes minutes, days, weeks, and months

---

[16] Rhizotomy is a minimally invasive surgical procedure to remove sensation from a painful nerve by killing nerve fibers responsible for sending pain signals to the brain.  The nerve fibers can be destroyed by severing them with a surgical instrument or burning them with a chemical or electrical current.

https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/rhizotomy

to develop ("the secondary injury"). The initial injury impaired Mr. Cushenberry's frontal lobes, which sit above the orbit where the skull curves and are responsible for motor function, problem solving, judgment, impulse control, and social and sexual functions. Additionally, Mr. Cushenberry sustained damage to his temporal lobes, which are behind the ears and responsible for processing auditory information, encoding memory, processing emotions, language, and visual perception. Dr. Lewine testified that Mr. Cushenberry's computer-generated brain images taken after the accident show an abnormally large volume of brain tissue in some areas as well as an abnormally smaller volume in other areas. He opined that Mr. Cushenberry has a two to four-fold increased risk for developing neurodegenerative diseases, including dementia and Alzheimer's disease, due to the brain injury.

Dr. Patricia Morgan, Mr. Cushenberry's treating neurologist, testified the frontal lobe damage resulted in changes to Mr. Cushenberry's personality, cognitive abilities, and memory capacity. Mr. Cushenberry underwent a 60-day inpatient rehabilitation treatment at Advantage Healthcare Rehabilitation Therapy in New Orleans. Following inpatient treatment, Mr. Cushenberry's mental status improved, his verbal I.Q. increased, and his visual memory improved. Dr. Morgan noted Mr. Cushenberry has residual problems with anxiety, depression, and insomnia, which she treated with various medications. Like Dr. Lewine, Dr. Morgan opined that Mr. Cushenberry is at significantly higher risk of developing dementia and Alzheimer's disease.

Dr. Susan Andrews, a licensed neuropsychologist, began treating Mr. Cushenberry six months after the accident. The results of the initial tests conducted on Mr. Cushenberry indicated deficits in his language function, verbal comprehension, attention, comprehension, memory, concentration, and executive

29

function[17]. They showed difficulties with visual/fine-motor coordination in both hands and an inability to control emotion. Dr. Andrews attributed these deficits and problems to the frontal lobe damage. She tested Mr. Cushenberry two years later and the results indicated significant improvement in verbal communication, fine motor coordination in both hands, visual memory, and immediate memory; however, deficits in executive function, processing speed, and language function remained. According to Dr. Andrews, the frontal lobe damage resulted mainly in a permanent change in Mr. Cushenberry's personality; he has lost his motivation, initiative, interest in doing things and is depressed. In her words, "[Frank] had both the flat affect (sic) of the depression because he recognized how much he could not do anymore, coupled with the fact that he also just wasn't motivated any longer. He didn't have the get-up-and-go initiative, the energy, the ability to organize things to do in his life." Dr. Andrews explained that the brain trauma adversely affected Mr. Cushenbery's "self-image." He is extremely self-conscious about his physical appearance, particularly his facial scars and hair loss, and wears a hoodie and cap to hide them in public.

As to how the injuries impacted his life, Mr. Cushenberry testified that he is no longer the person he used to be. He described himself as happy, easy going, peaceful and outgoing before the accident. He was the person his friends and family came to for advice, help and financial assistance. Mr. Cushenberry testified that his wife and children are the joy in his life, and he is their biggest cheerleader. From the time Noah was five years old until the accident, he coached Noah's little league football and baseball teams; Noah was 11 years old at the time of the accident. He

---

[17] The term "executive function," as used in psychology, is "the group of complex mental processes and cognitive abilities (such as working memory, impulse inhibition, and reasoning) that control the skills (such as organizing tasks, remembering details, managing time, and solving problems) required for goal-directed behavior."

https://www.merriam-webster.com/dictionary/executive%20function

brought Khloe to her weekly dance class and often danced ballet with her. Athletic his entire life, Mr. Cushenberry enjoyed playing in adult basketball and softball leagues. He took pride in physical appearance prior to the accident.

At home, Mr. Cushenberry cut the grass, did laundry, cooked regularly, and loved to entertain family and friends. Mr. Cushenberry considered his co-workers and customers at Capitol City Produce his "extended family." He went to work each day at 3:30 a.m., loaded his truck, helped others load theirs, and then delivered his produce to his customers. Mr. Cushenberry believed he had the perfect job because it allowed him to kiss his wife and kids before he left in the morning and be home in the afternoon when the kids returned from school. He took great pride in being recognized at work for following the rules and doing a good job. Mr. Prejean, the director of operations at Capitol City Produce, described Mr. Cushenberry as an excellent employee who was well-liked by his co-workers and customers.

Mr. and Mrs. Cushenberry were actively involved in their non-denominational church, Present Truth Prayer Center, for more than fifteen years. They attended Sunday and Wednesday night services, served as greeters, and participated in various ministries. Their pastor, Reverand Randy Smith, testified that he could always call on Mr. Cushenberry for anything the church needed.

Mr. Cushenberry testified everything has changed since the accident. He can no longer work or engage in the activities he once enjoyed. He feels like he is a burden to Mrs. Cushenberry because he can no longer help with the kids, clean house, or cook. Mr. Cushenberry is sad because he can no longer play with his kids, coach Noah's teams or dance with Khole. He describes himself as angry, irritable, and depressed much of the time. He experiences daily pain and headaches. He is often frustrated because he can no longer remember things. According to Mr. Cushenberry, he and Mrs. Cushenberry often argue now because she wants to travel and go places, while he prefers to stay home and avoid social gatherings because he

31

is embarrassed by his appearance. Despite these changes since the accident, Mr. Cushenberry acknowledged that he still can care for himself in many respects. He stands and walks unassisted. He can shower, dress, and use the toilet by himself. Mr. Cushenberry testified that he drives a car and runs errands for his wife around town. He explained that he babysits the kids by himself, and still attends some of their activities, including Noah's football practice. Since the accident, he has also enjoyed vacations and excursions with his family.

Mrs. Cushenberry testified that, prior to the accident, her husband was outgoing and fun to be around. He often organized dinners and parties for family and friends to share the foods he prepared. She described Mr. Cushenberry as the "go to person" everyone called upon and he helped anyone in need. She also described him as an outstanding father to Noah and Khloe. They absolutely adore their father, and he is "the favorite" parent. Mrs. Cushenberry said that, prior to the accident, her husband engaged in physical activities with both kids. He would get on the ground with Noah to show him how to tackle and he would dance ballet with Khloe. He motivated and challenged the kids to be their very best. Due to his constant pain since the accident, he rarely engages in physical activity with the kids, and he is impatient, irritable, and fussy.

Nonetheless, Mrs. Cushenberry still considers Mr. Cushenberry to be a loving husband. She testified they have always had a strong marriage and he still tries to help her with the house and children. Prior to the accident, Mr. Cushenberry cooked regularly. Now with his memory impaired, Mrs. Cushenberry no longer allows him to cook for fear he will forget to turn off the stove or grill. He can no longer cut the grass or do any heavy lifting. According to Mrs. Cushenberry, Mr. Cushenberrry has longed to return to college to obtain a degree in education so he could one day teach and coach in the local schools. Knowing that is no longer an option, he is angry and frustrated. Since the accident, Mrs. Cushenberry testified, she sometime feels like

32

she has another child.  However, she believes "[h]e's still a great husband. He's just – just not as – he's not what he was before."

Captain Jamaal Carter of the St. Gabriel Police Department, a childhood friend of Mr. Cushenberry, described him as funny, outgoing, always happy and "always there" when you call.  Noting the close bond between Mr. Cushenberry and his kids, Captain Carter testified Mr. Cushenberry is a man whose family is everything to him and a dad who is always excited to do things with his kids.  He also testified the accident has changed his friend. Mr. Cushenberry calls him all hours of the night complaining of the constant pain and has confided that it has put a strain on his marriage. Captain Carter testified that he now cuts the grass and does other tasks Mr. Cushenberry is no longer able to do around the home.

William Cushenberry, Mr. Cushenberry's uncle, testified that his nephew was an outstanding athlete who played multiple sports, excelled at all of them, and earned a football scholarship to Grambling University.  He described his nephew as a "jokester" who loved to tease his sisters and play around with his kids.  He has observed a change in his nephew's personality since the accident.  He described his nephew as distant and "looking off into space."  His nephew no longer jokes and is forgetful, angry, and irritable.  William Cushenberry said the accident robbed the children of their father because they no longer enjoy activities with him.  He also said his nephew's marriage and self-esteem has suffered because Mrs. Cushenberry is now solely responsible for their family.

With this evidence in support of Mr. Cushenberry's general damage award, we now review general damages awards in recent similar cases, keeping in mind that no two cases are alike. We consider the following similar cases in determining whether the award is so excessive as to constitute an abuse of discretion.

In *Brewer*, the plaintiff sustained significant injuries:  a traumatic injury to his right anterior temporal lobe which resulted in bed-wetting, seizures, short-term

memory deficits, a lowered I.Q., changed personality and disinhibition – problems which required long-term treatment at a brain-injury facility. In addition, he sustained more than fifty facial fractures, fractures to his right femur, left elbow, and finger. He had a torn spleen, necessitating removal, and two tears in his colon. He was hospitalized for thirty days in a comatose state, assisted by an artificial ventilator, and feeding tube. Brewer suffers from uncontrolled facial twitching and can no longer straighten his right arm. This Court affirmed the jury's award of $2,500,000.00. *Id.*, 09-1408, p. 2, 35 So. 3d at 233.

Similarly, in *Sabillon v. Max Specialty Ins. Co.*, 13-0513 (La. App. 4 Cir. 3/12/14), 137 So.3d 707, the plaintiff was injured when, while delivering cargo to a warehouse, a load fell from a forklift and struck a piece of lumber which went airborne and struck the plaintiff in the head. He sustained a head injury (including loss of consciousness), a nasal fracture, post traumatic headaches, cervical, thoracic and lumbar spine injuries, facial laceration, carpal tunnel syndrome, and left shoulder injuries. MRIs reflected bulging discs in the cervical spine, with a tear, bulging discs and a disc herniation in the lumbar spine, for which surgery was recommended. One physician testified that his traumatic brain injury was permanent and that he had brain atrophy and memory loss. The plaintiff's award of $3,833,333.00 in general damages was affirmed on appeal.

In *Duncan*, another traumatic brain injury case, the 11-year-old plaintiff was thrown from a van and sustained a traumatic brain injury and severed spinal cord injury, which rendered her a quadriplegic, totally dependent on others for all her needs. She suffered other medical complications, including a tracheostomy, a non-functioning left lung, difficulties with digestion and elimination associated with her paralysis, muscle spasms, contractions of her upper and lower extremities, anorexia, and depression. Despite the plaintiff's young age and the severity of her physical

and emotional injuries, this Court reduced the jury's $8,000,000.00 general damages award to $6,000,000.00.  *Id.*, 00-0066, p. 22, 773 So. 2d at 688.

*See also*, *Jenkins v. State ex rel. Dep't of Transp. & Dev.*, 06-1804 (La. App. 1 Cir. 8/19/08); 993 So.2d 749 , where an award of $3,000,000.00 was affirmed to a plaintiff who was rendered unconscious in an accident, underwent brain surgery for a subdural hematoma, and suffered rib fractures, spinal cord bruising, bulging and herniated discs of the lumbar and cervical spine, permanent hearing loss in one ear, vision problems (blurred vision, cranial nerve trauma), daily headaches, neck and back pain;  *Odom v. City of Lake Charles*, 00-01950 (La. App. 3 Cir. 1/31/01), 790 So. 2d 51, where the Third Circuit Court of Appeal affirmed a general damages award of $4,000,000.00 to the plaintiff who was a 29-year-old man whose truck struck an overpass bridge rail on I-10 in Lake Charles and vaulted over the railing onto the street below. He suffered a severe traumatic brain injury rendering him a quadriplegic. He is either bed bound, or wheelchair bound, wears diapers during the day, has a condom catheter at night, and requires 24-hour supervision. He was in the hospital for two months and then transferred to a neurological rehabilitation facility in Houston, where he was treated for five months.  He requires a feeding tube because he lost the ability to swallow and to eat. A permanent shunt in his brain drains the buildup of cerebral fluid into his abdomen; *Wingfield v. State ex rel. Dept. of Trans. and Development*, 01-2668, 01-2669 (La. App. 1 Cir. 11/8/02), 835 So. 2d 785, where the plaintiff, a commercial truck driver, sustained a permanent brain injury when his rig rolled over the railing of a sharply curving I-10 ramp and landed on the highway below.  In addition to his brain injury, the plaintiff suffered fractured ribs, numerous abrasions, trauma to the right forearm, a partially detached ear,

collapsed lungs, liver laceration, and a fracture of the femur. The jury's award of $5,000,000.00 was reduced by the court of appeal to $3,000,000.00.[18]

After carefully considering the evidence related to Mr. Cushenberry's injuries and their effects on his life in juxtaposition with the general damage awards in similar cases, we find that highest reasonable award for general damages is $5,000,000.00.

Next, we consider the loss of consortium awards to Mrs. Cushenberry and the children. Louisiana Civil Code article 2315 (B) authorizes the recovery of loss of consortium, service, and society as damages by the spouse and children of an injured person. An award for "loss of consortium" includes such pecuniary elements as loss of services and such non-pecuniary components as love, companionship, affection, society, sexual relations, comfort, and solace. *Emery v. Owens-Corp.*, 2000-2144 (La. App. 1 Cir. 11/9/01), 813 So. 2d 441, 456, *writ denied,* 2002-0635 (La. 5/10/02), 815 So. 2d 842. The elements of a minor child's claim for loss of service and society are essentially the same without, of course, the sexual component. *Moore v. Safeway, Inc.*, 95-1552 (La. App. 1 Cir. 11/22/96), 700 So. 2d 831, 860, *writ denied,* 97-2921 (La. 2/6/98), 709 So. 2d 735, and *writ denied,* 97-3000 (La. 2/6/98), 709 So. 2d 744.

The evidence in the record indicates Mr. Cushenberry has a close, loving relationship with his wife and is completely devoted to his children. Mr. Cushenberry's life-altering traumatic brain injury and physical disability have negatively impacted their lives forever. Based on the evidence, we find loss of consortium awards are warranted. However, considering the loss of consortium

---

[18] We decline to consider *Marable v. Empire Truck Sales of Louisiana, LLC*, 16-0876 (La. App. 4 Cir. 6/23/17); 221 So.3d 880, *writ denied,* 17-1469 (La. 11/13/17); 230 So.3d 210, the case cited by the Cushenberrys in which the plaintiff was awarded $40,000,000.00 in general damages, as that case is clearly an outlier.

awards in the following prior cases, we are convinced the jury abused its discretion and are compelled to reduce the loss of consortium awards in this case.

Recently, in *Malta*, 21-00209, p. 36, 333 So. 3d at 409-10, this Court found the trial court abused its discretion in awarding $50,000.00 for loss of consortium to the plaintiff's 12-year-old son. The Court concluded that the highest award reasonably within the trial court's discretion for loss of consortium was $15,000 when the "scant evidence" related to the issue showed generally that plaintiff and his son were unable to participate in some of the same outdoor activities that they enjoyed before the accident. After the accident, plaintiff became very bitter and angry and treated his family horribly, but his relationship with his son had greatly improved.

This Court, in *Hall v. Brookshire Brothers, Ltd*, 02-2404, p. 15 (La. 6/27/03), 848 So. 2d 559, 568-69, upheld a jury's loss of consortium award of $200,000.00 to a husband after his wife sustained a disability due to malpractice by a pharmacist and physicians in dispensing drugs and must now rely on her husband daily for assistance.

A jury, in *Thibodeaux v. Gulfgate Construction, LLC.*, 18-676 (La. App. 3 Cir. 3/7/19), 270 So. 3d 721, awarded loss of consortium damages of $150,000.00 to the wife of an AT&T employee who sustained severe injuries in a work-related accident when he fell into a sinkhole while splicing fiber optic cable. The court of appeal affirmed the loss of consortium award, finding no abuse of the jury's discretion. It noted the jury heard emotional testimony from Mrs. Thibodeaux that her husband of twenty-four years is a changed man since the accident. Mr. Thibodeaux's activities are now limited due to his pain and have stopped the couple from enjoying the outdoor activities they once did. The family can no longer take their yearly camping vacations because Mr. Thibodeaux cannot do the work associated with their travel trailer. Mr. Thibodeaux is no longer the "happy-go-

lucky" man his wife once knew. He is now short-tempered and has great anxiety over bills. Mrs. Thibodeaux testified that the family's financial burden has fallen on her since Mr. Thibodeaux can no longer work. She now works longer hours to make ends meet and the entire family is struggling because of his injury.

In *Boothe v. Department of Transportation and Development*, 18-0120 (La. App. 1 Cir. 9/21/18), 361 So. 3d 1, the plaintiff, Mrs. Boothe, sustained serious injuries in a single-car accident when she lost control of her vehicle on an icy bridge, crossed the median, flipped, and landed in the opposite lane. She suffered a cervical disc fracture and aggravation of a preexisting congenital condition, neither of which required surgery, but she had to wear a hard cervical collar for three months. The First Circuit Court of Appeal found the district court, in granting a judgment notwithstanding a verdict, did not abuse its discretion in awarding general damages of $600,000.00 to Mrs. Boothe and loss of consortium of $150,000.00 to her husband and $8,500.00 each to their minor children. However, the court of appeal vacated the consortium awards, finding they were legally extinguished pursuant to La. R.S. 13:5106(B)(1) and amended the $600,000.00 general damage award to reflect the statutorily imposed $500,000.00 cap set forth in La. R.S. 13:5106(B)(1). This Court granted writs and amended the court of appeal judgment to reduce the general damage award to $300,000.00, finding "the district court's general damage award of $600,000 rises to the level of an abuse of discretion." *Boothe v. Department of Transportation and Development and Paish of East Baton Rouge*, 18-1746, p. 11 (La. 6/26/19), 285 So. 3d 451, 458 (Hughes, J., dissented in part with reasons; Crichton, J., dissented and assigned reasons). The Court noted that that the plaintiffs did not seek review of the court of appeal's judgment insofar as it vacated the consortium awards or reduced the general damage award to the statutory cap of $500,000.00, and, therefore, those portions of the judgment were final.

38

The First Circuit Court of Appeal, in *Rentrop v. Arch Ins. Co.*, 17-0635 (La. App. 1 Cir. 12/29/17), 241 So. 3d 357, affirmed a jury's award of $250,000.00 to the spouse of a school bus driver who sustained serious injuries to his neck and back when a garbage truck rear-ended the bus he was driving. The evidence showed the driver required both cervical and lumbar discectomies and fusions. The couple's activities were limited due to his pain and stopped them from outdoor activities they once enjoyed. They had to forego their future retirement plans of buying a boat and traveling around the country. The wife testified that the accident caused a significant change in their lifestyle, including their loss of love and affection, and she now does most of the household chores because her husband cannot.

In *Barras v. Progressive Sec. Ins. Co.*, 14-898 (La. App. 3d Cir. 2/11/15), 157 So. 3d 1185, *writ denied*, 15-0512 (La. 6/1/15), 171 So. 3d 261, the court of appeal affirmed the jury's loss of consortium awards of $2,000.00 to the husband and amounts ranging from $500.00 to $1,500.00 to the five minor children of a woman who was awarded $25,000.00 in general damages for injuries she sustained in a car accident, which exacerbated a pre-existing back injury. The husband testified that her injury caused stress in their relationship, and "it was exhausting." *Id.*, p. 9, 171 So. 3d at 1193. The testimony also showed Mrs. Barras had limitations in terms of cooking, cleaning, and caring for the children, which included homeschooling them.

In *Wendel v. Travelers Ins, Co.*, 14-0002 (La. App. 4 Cir. 10/08/14), 151 So. 3d 828, *writ denied*, 14-2346 (La. 2/6/15), 158 So. 3d 818, a jury awarded the plaintiff, Mr. Wendel, $650,000.00 in general damages for injuries he sustained in a car accident, which included a herniated disc in his neck requiring surgical fusion, and lower back disc injuries requiring epidural injections. He was later diagnosed with having permanent "chronic regional pain syndrome." The jury awarded loss of consortium of $50,000.00 each to Mr. Wendel's two daughters, which the court of appeal affirmed. He testified the chronic pain limited his interaction and time with

his daughters; they lived with him full-time prior to the accident, but part-time now, because he cannot care for them.

The Third Circuit Court of Appeal, in *Savant v. Hobby Lobby Stores, Inc.*, 12-447, pp. 14-15 (La. App. 3d Cir. 11/7/12), 104 So. 3d 567, 576[19], affirmed a jury's loss of consortium award of $50,000.00 each to the minor children of the plaintiff who was injured when two large clocks fell from a wall display at Hobby Lobby. The jurors heard evidence about the plaintiff's life as a single mother to two boys, one of whom has autism. Prior to the accident, the plaintiff was an active mother who took her children bowling, skating, out to eat, to the waterpark, and engaged with them in their everyday play. The jury also heard testimony about her physical and emotional limitations following the accident. She could no longer be the active and engaged mother she was before.

The Fourth Circuit Court of Appeal in *Ritter v. Exxon Mobile Corporation*, 08-1404, p, 11 (La. App. 4th Cir. 9/9/09), 20 So. 3d 540, upheld a jury's award of general damages of $4,550,000.00 to the plaintiff, Mr. Ritter, and loss of consortium of $250,000.00 to Mrs. Ritter, and $50,000.00 each to their three children. Mr. Ritter, a pipefitter, sustained life-changing injuries in an oil refinery accident. He underwent the amputation of part of his arm and the insertion of a metal plate, the reconstruction of his left upper arm with multiple operations to remove necrotic tissue involving multiple closures and skin grafts, a cervical fusion at C5–6, and shoulder surgery. Mr. Ritter suffers from phantom pain, insomnia, sleep disorders, major depression, and post-traumatic stress disorder because of the accident.

Lastly, in another Fourth Circuit case, *Turner v. Lyons*, 03-0186 (La. App. 4. Cir. 1/28/04), 867 So. 2d 13, *writ denied*, 04-0741, (La. 5/14/04), 872 So. 2d 530, the court reduced the loss of consortium awards of $150,000.00 each to six adult

---

[19] Writ not considered, 12-2685 (La. 2/8/13), 107 So. 3d 640.

children whose mother suffered a heart attack after she was injured in a collision with a New Orleans Police Department officer in an a NOPD vehicle and later died of heart complications. The awards to the two children who testified at the trial were reduced to $50,000.00 and the awards to the four others to $20,000.00.

Adhering to the standard of review and directive recently set forth by this Court in *Pete*, based on the evidence presented to the jury and the loss of consortium awards in prior cases, we conclude the highest award reasonably within the jury's discretion for loss of consortium is $400,000.00 to Mrs. Cushenberry and $100,000.00 each to Noah and Khloe.

### DECREE

Based on the forgoing, the judgment in this matter is amended to reallocate fault 80 percent to Barber Brothers and 20 percent to Mr. Cushenberry, reduce the general damage award to Mr. Cushenberry to $5,000,000.00 and the loss of consortium awards to Mrs. Cushenberry and each minor child to $400,000.00 and $100,000.00, respectively, and as amended, the judgment is affirmed.

**AFFIRMED AS AMENDED.**

# SUPREME COURT OF LOUISIANA

## No. 2023-C-00788

## BARBER BROTHERS CONTRACTING COMPANY, LLC

### VS.

## CAPITOL CITY PRODUCE COMPANY, LLC; FRANK CUSHENBERRY; AND XYZ INSURANCE COMPANY

### C/W

## FRANK CUSHENBERRY AND ROBIN CUSHENBERRY, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILDREN, NOAH CUSHENBERRY AND KHLOE CUSHENBERRY

### VS.

## JOHNNY SCOTT AND BARBER BROTHERS CONTRACTING COMPANY, LLC

On Writ of Certiorari to the Court of Appeal, First Circuit,
Parish of East Baton Rouge

**HUGHES, J., dissenting.**

The tort victim in this case, Mr. Cushenberry, was severely injured when the produce freight truck he was driving at night on the interstate crashed into a road construction truck, which was driving in reverse along the shoulder. The more than $13 million jury verdict in favor of Mr. Cushenberry and his family included $10.75 million in general damages. I dissent from the majority's decision to cut that award in half, despite the deference owed to the decision of the jury.

Immediately after the accident, Mr. Cushenberry was in critical condition, having severe physical injuries that included substantial head and facial injuries (encompassing fractures in an eye socket, a cheekbone, both upper and lower jaw bones, the initial swelling of which caused an inability to breathe or use his throat, mouth, or tongue), as well as a herniated cervical disc, a torn rotator cuff and torn cartilage in the left shoulder, and a serious hospital-acquired respiratory infection. Mr. Cushenberry had to undergo a blood transfusion, reconstructive facial surgery,

an anterior cervical discectomy with a fusion, two arthroscopic shoulder surgeries, two laser scar revision procedures under general anesthesia, and extensive physical and rehabilitative therapy.  Mr. Cushenberry's traumatic brain injury left him with multiple impairments, consisting of problems with decision-making, mental processing speed, attention, daily headaches, depression, anxiety disorder, post-traumatic stress disorder ("PTSD"), emotional issues, social disabilities, memory problems, agitation, apathy, insomnia, and a resultingly and significantly higher risk of developing dementia and Alzheimer's disease.  In addition, Mr. Cushenberry has become extremely self-conscious about his physical appearance, particularly his facial scars and hair loss, and he wears a hoodie and cap to hide them in public.

The appellate court affirmed the jury's damage awards.  However, citing **Pete v. Boland Marine & Mfg. Co., LLC**, 23-00170, pp. 9-10 (La. 10/20/23), 379 So.3d 636, 643-44, this court's majority opinion holds:  "Based on a review of the record, coupled with a study of prior awards in *truly similar* cases, we conclude that the jury abused its discretion in this award."  (Op. at p. 26; emphasis added.)

However, the "study of prior awards in truly similar cases," undertaken in the majority opinion, includes only the following six cases, all but one of which were rendered more than fourteen years ago:  **Brewer v. J.B. Hunt Transp., Inc.**, 09-1408 (La. 3/16/10), 35 So.3d 230; **Duncan v. Kansas City S. Ry. Co.**, 00-0066 (La. 10/30/00), 773 So.2d 670; **Sabillon v. Max Specialty Ins. Co.**, 13-0513 (La. App. 4 Cir. 3/12/14), 137 So.3d 707; **Jenkins v. State ex rel. Dep't of Transp. & Dev.**, 06-1804 (La. App. 1 Cir. 8/19/08), 993 So.2d 749, writ denied, 08-2471 (La. 12/19/08), 996 So.2d 1133; **Wingfield v. State ex rel. Dep't of Transp. & Dev.**, 01-2668 (La. App. 1 Cir. 11/8/02), 835 So.2d 785, writs denied, 03-0313, 03-0339, 03-0349 (La. 5/30/03), 845 So.2d 1059; **Odom v. City of Lake Charles**, 00-01050 (La. App. 3 Cir. 1/31/01), 790 So.2d 51, writ denied, 01-1198 (La. 6/22/01), 794 So.2d 787.

2

Further, none of the six cases cited by the majority, in support of its reduction of the general damage award, as "truly similar cases," are truly similar to the instant tort victim's particular facts and circumstances, nor does the majority mention the word "inflation."

**Brewer v. J.B. Hunt Transp., Inc.**, 09-1408 at p. 22, 35 So.3d at 245, rendered in 2010, involved a 23-year-old trucking accident victim who was awarded $2.5 million in general damages and over $10 million in special damages; however, "[n]either party assign[ed] error to the amount of the damages assessed" before this court; therefore, the amount of damages was not reviewed. The only issue addressed by this court in **Brewer** was the assessment of fault to the parties to the accident; therefore, the particular facts and circumstances related to the **Brewer** plaintiff's injuries were not set forth in the **Brewer** opinion, beyond the recitation of the following general description: "Brewer sustained permanent, debilitating injuries in the accident, including a traumatic injury to the right anterior temporal lobe of his brain which has resulted in bed-wetting, seizures, short-term memory deficits, a lowered I.Q., changed personality and disinhibition—problems for which Brewer will require long-term treatment at a residential brain-injury facility." **Id**., 09-1408 at p. 3, 35 So.3d at 234. Accordingly, whether the **Brewer** plaintiff's injuries were "truly similar" to Mr. Cushenberry's injuries in the instant case is uncertain, and the **Brewer** case should not have been considered in reviewing the damages herein.[1]

The suit in **Duncan v. Kansas City S. Ry. Co.**, 00-0066 at p. 1, 773 So.2d at 674, rendered in 2000, was filed to recover damages sustained by three sisters who

---

[1] In fact, it was evident from the **Brewer** opinion that the plaintiff's pre-accident history could have negatively affected the amount of general damages awarded, to the extent that the plaintiff had a history of substance abuse, a problematic employment history with a least one termination for an alleged theft of materials, and a criminal record; there was also an alleged failure to mitigate damages. **Id**., 09-1408 at pp. 6-10, 35 So.3d at 235-37. In contrast, in the instant case, the testimony showed that Mr. Cushenberry had led an exemplary life before his accident, as a good husband, father, and provider for his family, as well as a valuable employee and thoughtful friend and relative, who had planned to return to school to further his education in order to become an educator and coach.

3

were riding in a church bus that collided with a train; the 12-year-old sister was killed, her 11-year-old sister suffered traumatic spinal cord and brain injury, and their 7-year-old sister sustained less serious injuries. A total of $27 million was awarded to the plaintiff/parents on behalf of the three sisters. On review by this court, the $8 million in general damages awarded to the quadriplegic child was reduced to $6 million, after a "review of cases involving similar injuries."[2] **Id.**, 00-0066 at p. 15, 773 So.2d at 683. The **Duncan** case is not "truly similar" to the case currently under review by this court, since the facts and circumstances surrounding an 11-year-old girl becoming a quadriplegic can in no way be compared to the facts and circumstances surrounding the approximately 40-year-old Mr. Cushenberry becoming brain damaged – these are not "truly similar" facts and circumstances.

In **Sabillon v. Max Specialty Ins. Co.**, 13-0513 at pp. 1-2, 137 So.3d at 709, rendered in 2014, total damages of over $4.6 million were awarded to a 46-year-old truck driver, who suffered injuries when the forklift being used to unload his truck dropped the load and caused a piece of lumber to become airborne and strike him in the head. On the **Sabillon** plaintiff's first visit to his internist, less than a week after the accident, the doctor's clinical impression was that plaintiff suffered a head injury with loss of consciousness, post traumatic headaches, cervical, thoracic and lumbar pain, a facial laceration, and left-sided shoulder pain. **Id.**, 13-0513 at pp. 7-8, 137 So.3d at 712. However, the exact presentation of the initial injury was not described and it does not appear from the opinion that the plaintiff was seen in an urgent care facility contemporaneous with the accident. Regardless, testimony revealed that the **Sabillon** plaintiff "returned to work driving a truck a few weeks after the [February 3, 2010] accident," and testimony at the 2012 trial further revealed that the plaintiff

---

[2] In addition, the future medical expenses awarded for the quadriplegic child was amended from the amount based on a life expectancy of 81 years to that applicable to a life expectancy of 57 years. In all other respects, the trial court award was affirmed. **Id.**, 00-0066 at pp. 19-21, 773 So. 2d at 686-87.

4

was "able to work in gainful employment at wages equal to or above those he was earning at the time of the accident." **Id.**, 13-0513 at p. 3, 137 So.3d at 710. Although a vocational rehabilitation expert testified during the **Sabillon** trial that the "plaintiff's skills are specific to driving 18-wheel trucks, and are not transferrable to other types of work," the expert also recognized that the plaintiff had an income "of $56,123.00" in 2011, which was about the same as "the annual earning rate of $57,100.00 that her research showed could be earned by Louisiana truck drivers." **Id.**, 13-0513 at pp. 3-4, 137 So.3d at 710. By the time of trial, the **Sabillon** plaintiff had only "sustained $4,690.00 in lost wages." **Id.**, 13-0513 at p. 4, 137 So.3d at 710. Another vocational rehabilitation expert testified at the **Sabillon** trial that the "plaintiff could drive a pickup truck, car or van, and perform sedentary to light duty work, such as being an escort driver, a delivery driver or courier, and he also stated that plaintiff could probably perform some jobs that do not involve driving, such as assembly work and janitorial work"; it was this expert's opinion that the plaintiff did not sustain a loss of earning capacity as a result of the accident" and that he could "continue to earn wages similar to those earned prior to the accident." **Id.**, 13-0513 at pp. 4-5, 137 So.3d at 710-11. Conflicting medical testimony was presented as to whether the subject accident to the **Sabillon** plaintiff had caused the injury, which resulted in his brain atrophy, scarring, and memory problems. **Id.**, 13-0513 at pp. 8-9, 137 So.3d at 713. Notwithstanding, once again, the **Sabillon** case does not represent facts and circumstances "truly similar" to the case currently before us. Although it was found that the **Sabillon** plaintiff suffered a brain injury, a facial "laceration," and two levels of spinal disc herniation, the injuries to Mr. Cushenberry in the instant case were substantially worse. While the **Sabillon** plaintiff was hit by an airborne piece of lumber, the box truck Mr. Cushenberry was driving was propelled by the collision off the travelled portion of the interstate, flipped over, and landed in the woods. Further, Mr. Cushenberry was immediately hospitalized in

5

critical condition with life-threatening injuries, but there is no indication that the **Sabillon** plaintiff received any medical care until he saw his internist "less than a week after the accident." The **Sabillon** plaintiff suffered a facial laceration; in the instant case Mr. Cushenberry's face was crushed and had to be reconstructed, in addition to subsequent scar revision surgeries and surgeries to correct his herniated disc(s) and shoulder injuries. The **Sabillon** opinion does not indicate that the plaintiff received any surgical treatment, though epidural steroid injections were recommended it was not stated that plaintiff underwent these injections. Moreover, at the time of trial the **Sabillon** plaintiff had continued to work, though for slightly less wages; but in contrast, in this case, Mr. Cushenberry can no longer work or perform many of the chores around the house that he had customarily performed prior to his accident.

In the **Jenkins** case, rendered in 2008, the plaintiff, a volunteer reserve police officer, was responding to a motor vehicle accident in a rainstorm, with another officer who was driving the police unit, when the unit hydroplaned, sliding across the center line and entering the opposite lane, where it collided with a tractor-trailer; as a result of the accident, the plaintiff was rendered unconscious and sustained serious head injuries. **Jenkins v. State ex rel. Dep't of Transp. & Dev.**, 06-1804 at pp. 2-3, 993 So.2d at 755. In the ensuing lawsuit, the jury rendered a total damage award of more than $10.8 million. After the accident, Mr. Jenkins was taken by ambulance to the emergency room, and he was found to have bulging/herniated discs at several spinal levels, three fractured ribs, and also cerebrospinal fluid dripping from his right ear due to a fracture of the base of the skull; he was diagnosed with an acute subdural hematoma (described as "a blood clot between the covering of the brain and the brain's outer surface"), which required two craniotomy surgeries. **Id.**, 06-1804 at pp. 27-28, 993 So.2d at 767-68. Mr. Jenkins subsequently was found to have some permanent brain damage, causing reduced executive decision-making

6

skills, permanent loss of hearing in his right ear, headaches, and vision problems; and he had to give up his lawncare business and take a maintenance job at a lower rate of pay. The **Jenkins** court ruled that the jury did not abuse its vast discretion in its award of $3 million in general damages to the plaintiff; however, the award was amended to apply the $500,000 statutory cap applicable to the governmental defendants. **Id.**, 06-1804 at p. 35, 993 So.2d at 772. Although the facts and circumstances of the **Jenkins** case are closer to those of the instant case, they are nevertheless not "truly similar," since in this case Mr. Cushenberry had more extensive injuries and was not able to engage in any employment after his accident.

In **Wingfield v. State ex rel. Dep't of Transp. & Dev.**, rendered in 2002, the surviving tort victim was awarded $5 million in general damages after he was involved in an eighteen-wheeler accident and suffered a catastrophic brain injury, never regaining consciousness (he was described as only minimally responsive); therefore, the **Wingfield** case is certainly not "truly similar" to the case currently before this court. In fact, the **Wingfield** court recognized the crucial distinction by stating: "The level of physical and mental suffering, for a minimally aware victim, is not the same for a fully cognizant victim." **Id.**, 01-2668 at p. 28, 835 So.2d at 807.

The final case cited by the majority, **Odom v. City of Lake Charles**, 00-01050 at pp. 1-2, 790 So.2d at 53, rendered in 2001, arose out of a single-car accident that occurred when the tort victim suddenly encountered stopped traffic on an elevated interstate bridge and abruptly changed lanes, struck the overpass bridge rail, and fell onto the street below; he suffered serious injuries including a closed head injury that completely incapacitated him. The **Odom** tort victim's curator was awarded $4 million on his behalf for general damages, which was affirmed on appeal. As stated with respect to the **Wingfield** case, the **Odom** case is likewise not

7

"truly similar" to the case herein under consideration, since the **Odom** tort victim was not fully cognizant after his accident.

Neither the **Wingfield** nor the **Odom** tort victims were fully cognizant victims (rather they remained at most merely minimally responsive after their respective accidents), while the tort victim at issue in this case, Mr. Cushenberry, is fully cognizant that he has suffered brain impairments that have rendered him unable to function as he did before the accident. Since there are no "truly similar" cases to the facts and circumstances present in the instant case, we are relegated to an evaluation of whether the jury in this case abused its much discretion in fixing the general damage award for this tort victim.

As this court stated in **Eastman v. State Farm Mutual Automobile Ins.**, 23-01107, p. 8 (La. 5/1/24), ___ So.3d ___, ___ (2024 WL 2097939 at *5) (McCallum, J., writing for the court) (footnote omitted):

> This Court recently expounded on the important role of juries. We noted that "[c]onfidence in juries, and their ability to handle and decide difficult, factual questions, is reflected in the legislature's recent amendment[s]" to the Louisiana Code of Civil Procedure. **CD v. SC**, 2022-00961, p. 4, n.5 (La. 6/1/23), 366 So.3d 1245, 1249 [n.5]. "When there is a jury, the jury is the trier of fact." **Scott v. Hospital Service Dist. No. 1 of St. Charles Parish**, 496 So.2d 270, 273 (La. 1986). "We hold juries in high regard and accord them great deference in their decisions." **CD**, 2022-00961, p. [4] n.5, 366 So.3d at 1249 [n.5]. This deference recognizes that the right to a jury is statutorily protected. <u>See</u> La. C.C.P. art. 1731 A; <u>See also</u> La. C.C.P. art. 1736. Thus, overturning a jury's verdict that is reasonably supported by the record is, in essence, the denial of the parties' right to be heard and judged by the jury.

Furthermore, this court's **Eastman** opinion emphasized the "wisdom of the crowd," famously demonstrated by Sir Francis Galton at an English county fair, when "Sir Francis contrived a competition to guess the weight of a dressed ox" and "[t]he median of 787 guesses, by laypeople, proved to be astonishingly accurate, less than one percent off of the true weight." **Eastman**, 23-01107 at p. 1 n.1. Likewise, the wisdom of the crowd in the instant case, as expressed by the duly-selected jurors, should be honored and its award for general damages upheld.

8

For these reasons, I dissent from the majority decision to cut in half the $10.75 million in general damages awarded by the esteemed jury, who observed and participated in the live presentation of evidence while appellate courts merely review the cold transcript, as recognized in **CD v. SC**, 22-0096 at p.4 n.5, 366 So.3d at 1248-49 n.5 (McCallum, J., writing for the court).

SUPREME COURT OF LOUISIANA

No. 2023-C-00788

BARBER BROTHERS CONTRACTING COMPANY, LLC

VS.

CAPITOL CITY PRODUCE COMPANY, LLC; FRANK CUSHENBERRY;
AND XYZ INSURANCE COMPANY

C/W

FRANK CUSHENBERRY AND ROBIN CUSHENBERRY, INDIVIDUALLY
AND ON BEHALF OF THE MINOR CHILDREN, NOAH CUSHENBERRY
AND KHLOE CUSHENBERRY

VS.

JOHNNY SCOTT AND BARBER BROTHERS CONTRACTING
COMPANY, LLC

*On Writ of Certiorari to the Court of Appeal, First Circuit,*
*Parish of East Baton Rouge*

**GRIFFIN, J., dissents for the reasons assigned by Justice Hughes and assigns additional reasons.**

I respectfully dissent from the majority's decision to lower the amounts of general damages and loss of consortium awarded by the jury. I also reiterate my position that courts must acknowledge the realities of inflation in reviewing awards for general damages. *Pete v. Boland Marine and Manufacturing Co., LLC*, 23-0170 (La. 10/20/23), 379 So.3d 636, 651 (Griffin, J., concurring in part and dissenting in part); *Coco v. Winston*, 341 So.2d 332, 335-36 (La. 1976).